<hr/>

ROUP *v.* ROUP.

> $\overline{136}$   $\overline{3.5}$
> d140 ¹191

1. Deeds—Delivery—Evidence.

A husband and his wife executed deeds of their farm to their two sons, and, on their return home, the wife, in the presence of the husband, handed the deeds to the sons, saying, "Boys, here are your deeds." By her directions the sons then placed the deeds in a box in which the father kept his private papers, which box was then and thereafter kept in his bedroom. The parents subsequently mortgaged the land, and lived upon and controlled the premises as if their own. *Held*, that such facts did not establish a delivery of the deeds.

> | 136 | 385 |
> | e153 | 24 |

2. Same.

A statement signed by the parents, that "the deeds that *we have made over* to" the sons "are not to be recorded until after we are both dead, and then the boys are to give" their sister "a note for $500 for her share; after this is done, the deeds are to" belong to the sons,—and intended to be attached to the deeds, did not indicate an understanding that the deeds had been delivered.

Appeal from Calhoun; Winsor, J. Submitted November 20, 1903. (Docket No. 149.) Decided April 26, 1904.

Bill by Clark A. Roup against Waylie A. Roup to set aside a deed. From a decree for complainant, defendant appeals. Affirmed.

*John C. Patterson*, for complainant.

*Hatch & Page*, for defendant.

MOORE, C. J. This is an appeal from a decree granting the relief for which complainant prayed in his bill of complaint. The case was tried in open court. The trial judge filed a very carefully prepared opinion, which states the questions involved so clearly that we quote a portion of it:

"Complainant prays that two deeds, now recorded in the office of the register of deeds of Calhoun county in Liber 177 of Deeds, at pages 104 and 105, respectively, be annulled, vacated, canceled, and set aside, and that defendants be required to surrender the same to the register of this court for cancellation, * * * and that the cloud caused by said deeds and the records thereof upon complainant's title to the premises described in said bills of complaint be removed, and complainant's title thereto quieted.

"Complainant in this case is the father of the two defendants, and the deeds in question were voluntarily made by himself and his then living wife, Candace A. Roup, on the 6th day of October, 1899, while they were residents of the county of Isabella, in this State. Defendants had always lived at home with their father and mother, and were living with them at the time the deeds in question were executed. Wayne A. Roup was a minor son, and Waylie A. Roup about 30 years of age, at that time. Complainant claims that, in order to avoid the expense of administration upon his estate after the death of himself and his wife, they had the deeds prepared, and executed them, intending to keep them in their possession, and after their deaths defendants were to take the deeds and record them, paying their sister, Myrtie Henry, $500, thus settling the estate without the aid and procedure of the probate court. Complainant also claims that, after the execution of the deeds, they were brought to the home in Isabella county by himself and his wife, and were put into a paper shoe-box, which was kept in his bedroom in or upon a stand, in which shoe-box he kept all his private papers; that the deeds remained in this box until after he removed his family and goods to Calhoun county, in the fall of 1899, when he went into possession of the farm in

question, and lived there with his family just as they had always lived in Isabella county; that, after the removal of the family to the Calhoun county farm, the paper shoe-box containing the deeds in question and other papers, such as insurance policies and pension papers, were put in the bureau drawer in complainant's bedroom, and there remained until he missed them from the shoe-box, in June, 1901; that his wife, Candace A. Roup, died October 28, 1900, after a short illness, and that the last time complainant saw the deeds was in March, 1901. Complainant claims that, after he missed them, he immediately made inquiries in regard to their whereabouts, and that he asked defendants if they had taken them, but that they disclaimed any knowledge of the disappearance. Complainant alleges that the deeds were never delivered to defendants, and that he was at all times in the actual possession and control of them; that he did not owe either of the defendants for labor or otherwise, and never made any agreement with them, or either of them, to pay them for any labor by conveying the lands in question to them. It is further claimed that complainant, with his wife, Candace, always used and occupied the lands and home as theirs after the execution of the deeds in question, and improved the property, and gave and executed a mortgage for $600 on the same; and that defendants never had any financial interest in said farm. This states sufficiently the claim of complainant to raise every question which it will be necessary for this trial court to consider.

"Defendants set up and claim that, while they worked and labored at home with their father and mother, they put into the farm in Isabella county all they earned at home and abroad, and that complainant had agreed to pay Waylie A. Roup $20 per month if he would remain at home and assist in working the farm with his brother, Wayne, and care for complainant and his wife during their lifetime; but that, when complainant bought the farm in Calhoun county, he, together with his wife, Candace, agreed to and did make the deeds to them in payment for their labor, etc.; that, on the day the papers were executed, they were delivered to defendants by the mother, and in the presence of complainant, and defendants were told by the mother, in his presence and hearing, what the papers were, and they received them from her, and read them, and each, under the direction of their mother, put them in the paper shoe-box in complainant's

bedroom, with the other papers contained therein. Defendants claim that this box was a kind of family receptacle for the keeping and preserving of valuable papers for all the family, and that it was used by them all for that purpose. Defendants further claim that while the mother was sick, and just a few days before her death, she called her oldest son, Waylie, to her bedside, and told him to take the deeds out of the box and have them recorded; that in March, 1901, after Candace A. Roup died, the defendant Waylie A. Roup took the deeds out of the box, and gave them to his sister, Myrtie Henry, who kept them until the 30th day of September, 1901, and then had them recorded. There is no claim that complainant knew who took the deeds away until after they were recorded. On the other hand, it is claimed complainant was searching and making inquiries for them from the time they were missed until he learned what had become of them. There is no claim or pretense that he was consenting or knew of the removal of the deeds.

"The principal question in this case, and the one to be first determined by the court, is, Were the deeds delivered by the grantors to the grantees, the defendants in this case, at the time they were executed and brought to their home in Isabella county, on October 6, 1899? The delivery of a deed is the essential act on the part of the grantor to give life to the transaction, or to give it any force whatever. In addition to this, of course, must be acceptance by the grantees. There is no question but that the deeds were executed by complainant and his wife, Candace, to the defendants, as grantees, and that they were brought home and read by defendants, and at the suggestion of the mother were put into the paper box kept by complainant in his bedroom. Taking defendants' theory and testimony of what occurred in the home on the evening of October 6, 1899, it would seem that the mother was the moving spirit in what transpired there. Defendant Wayne A. Roup testified:

" 'Q. Do you remember the occasion of you father and mother getting these deeds, Exhibits A and B, and bringing them home?

" 'A. Yes, sir.

" 'Q. What time was it they brought them home,—what time in the evening?

" 'A. Well, it was after dark when I saw them first. I could not say what time.

" 'Q. What occurred when they came in? Just go on and tell

the court what occurred when they came in with the papers, or when they came into the house.

" '*A.* We had been at work either husking or cutting corn at the time, and when we came from work it was late, because we were getting ready to move down here, and we worked late. My brother would come up (Waylie) and do the chores,—we had nine cows to milk,—and he would come up and do the chores, and I would work later in the field. Some nights when it was moonlight I would work until 8 o'clock. And when I came up mother brought the deeds.

" '*Q.* (interrupting). What did she say to you ?

" '*A.* She said, "Boys, here are your deeds," and handed one to me and one to my brother.

" '*Q.* What did you do with them ?

" '*A.* I read them over, and put them in the box that he has been telling about.

" '*Q.* Who put them in ?

" '*A.* Us boys. * * *

" '*Q.* Now, you may state how far your mother was, or your father, rather, when your mother handed one of these papers to you and the other to Waylie and said, "Boys, here are your deeds." How far away were you at that time ?

" '*A.* I should think about six or eight feet.

" '*Q.* Did he say anything ?

" '*A.* No, I don't remember as he said anything.

" '*Q.* What was said, if anything, about when they were to be recorded, or anything of that kind, by your father and mother, at that time, or by any of you ?

" '*A.* Well, I don't know as there was anything said just then when they were to be recorded. * * *

" '*Q.* Was there any statement that you should not put them on record ?

" '*A.* No, sir.

" '*Q. By the Court:* Why did you put them in the box ? Why did you not take them down for record at once ?

" '*A.* As long as my mother was living they were safe without recording.'

"Upon cross-examination the same witness testified :

" '*Q.* Who did the talking?

" '*A.* My mother.

" '*Q.* Did you say anything, or make any reply?

" '*A.* No, I don't know as I did.

" '*Q.* Did Waylie make any reply?

" '*A.* No. They were handed to us, and we read them over.·

" ' *Q.* Did you read them?

" ' *A.* Yes.

" ' *Q.* Then you gave them back to your parents, your father and mother?'

" ' *A.* We put them in that box.

" ' *Q.* Who did?

" ' *A.* We did, us boys.   *   *   *

" ' *Q.* Where was this box?

" ' *A.* Well, I don't just remember now. It was moved around from place to place.

" ' *Q.* Where was your mother sitting when you put them in that box?

" ' *A.* She was sitting in the kitchen, where she was when they were handed to us.

" ' *Q.* Where was your father sitting when they were put in there?

" ' *A.* He was in there with us, I think.

" ' *Q.* Where was this box when they were put in it?

" ' *A.* I think it was in their bedroom.'

"In the direct examination of Waylie A. Roup upon the same subject we find the following:

" ' *Q.* You have seen these two deeds here, one to Wayne A. Roup and one to Waylie A. Roup, Exhibits A and B?

" ' *A.* Yes, sir.

" ' *Q.* Do you know anything about these, or was there any talk to you about their being made before they were made?

" ' *A.* Mother spoke to me about it.

" ' *Q.* Was your father present on that occasion?

" ' *A.* I rather think he was.

" ' *Q.* What was said,—what did your mother say to you about it?

" ' *A.* She said she was going to get them made out for me and my brother.   *   *   *

" ' *Q.* Do you remember the occasion of the making of the deeds to yourself and Wayne?

" ' *A.* Yes.

" ' *Q.* Do you remember the occasion of their bringing them home?

" ' *A.* Yes.   *   *   *

" ' *Q.* What time was that you saw those papers?

" ' *A.* Eight o'clock at night.

" ' *Q.* Now, just state to the court what was said and what was done when you saw these papers.

" ' *A.* "Here," she says, "Waylie, is your deed, and here, Wayne, is your deed."

"'*Q.* What did she do,—hand them to you ?

"'*A.* Handed them to us, and had us read them over. After we read them over she said we might put them in the box.

"'*Q.* Where was your father at this time ?

"'*A.* In the house.

"'*Q.* Where was he ?

"'*A.* Right close by there.   *   *   *

"'*Q.* Then what did you do when your mother handed them to you ?

"'*A.* Read them over, and put them in the box.   *   *   *

"'*Q.* What box ?

"'*A.* In the box there that was used by the family to put our papers in.'

"I have quoted so much of defendants' testimony to show just what occurred at the time of the alleged delivery of the deeds.   In passing, it is well to notice that the evidence in regard to what transpired the night of the return from Calkinsville, where the deeds were prepared and executed, was absolutely denied by the complainant, Clark A. Roup.   But, notwithstanding the denial, the testimony nowhere shows that the father, the complainant in this case, ever delivered the deeds manually to the defendants, or had any talk with them about it.   Hence we must look further, and determine whether, by his acts or by his nonaction, he was consenting to an absolute delivery on the evening of October 6, 1899.   The talk in regard to the deeds was had with the mother, as the evidence shows, and she is not here to give her version of the conversation. Complainant did not seem to take any active part in the talk between the mother and the sons, and when we examine these conversations there is nothing from which we can infer that the deeds were to be delivered presently. They were warranty deeds of the home, and only home, then owned by the complainant and his wife, Candace, and there was no reservation of any kind therein. The delivery of such deeds would, if delivered and accepted, immediately vest in the grantees all right and title to the lands, and complainant and his wife be wholly divested thereof, and subject to the whims and caprices of the defendants.   This, to me, does not seem rational, and the future actions of the parties confirm me in the belief that it was not their intention.   Defendants suggest that their father and mother would hold a life estate in the land; but that was not provided for in the deeds, nor was any such agreement shown or proven upon the hearing.   This

court could not change the agreements, if any, had between the parties; nor can it make bargains for the parties upon the hearing, but must consider them with the case as presented. Complainant and his wife, Candace, moved onto the farm in Marengo after the deeds were executed, carrying with them in the same shoe-box the papers and deeds, and took them more fully into their own possession and control, if possible, by putting them in their own bureau drawer in their own bedroom.

"It is a well-settled rule of law that:

"'The delivery of a deed implies a parting with the possession and a surrender of authority over it by the grantor at the time, either absolutely or conditionally,—absolutely if the effect of the deed is to be immediate, and the title to pass or the estate of the grantee to commence at once; but conditionally if the operation of the deed is to be postponed or made dependent on the happening of some subsequent event. A conditional delivery is and can only be made by placing the deed in the hands of a third person until the happening of the event on which the deed is to be delivered over by the third person to the grantee. But it is an essential characteristic and an indispensable feature of every delivery, whether absolute or conditional, that there must be a parting with the possession of the deed, and with all power and control over it, by the grantor for the benefit of the grantee at the time of the delivery.'

"This is the doctrine suggested by *Prutsman* v. *Baker*, 30 Wis. 644 (11 Am. Rep. 592). * * *

"In the case of *Thatcher* v. *St. Andrew's Church*, 37 Mich. 268, the court said:

"'One of the essential requisites to the validity of a deed, so as to pass the title, is delivery. Even although in all other respects it has been properly executed, yet it does not follow that the title to the property passes. The grantor yet retains control of the instrument, and may deliver it absolutely, conditionally, or not at all. The act of delivery is not necessarily a transfer of the possession of the instrument to the grantee and an acceptance by him, but it is that act of the grantor, indicated either by acts or words, or both, which shows an intention on his part to perfect the transaction by a surrender of the instrument to the grantee, or to some third person for his use and benefit. The whole object of a delivery is to indicate an intent upon the part of the grantor to give effect to the instrument.'

"In the case of *Stevens* v. *Castel*, 63 Mich. 117 (29 N. W. 828), the court, in commenting upon the decision of *Thatcher* v. *St. Andrew's Church*, said:

" 'If this be good law,—and I think it is,—it necessarily follows that any act presumptively a delivery will not be a delivery if the intent to make it such is wanting, or expressly negatived by the acts or words of the grantor.'

" I think the authorities above quoted establish the true rule in these cases. It is clear that the question of delivery of deeds is a question of fact, and delivery in the lifetime of the grantor must be proven, and each case determined from its own state of facts. The deeds in question must have been delivered, if at all, so as to pass out of the control of the grantors, as before expressed, and that the intention was that they should operate as present conveyances of title. *. * *

"It becomes necessary, therefore, from the facts in this case to determine whether complainant delivered the deeds in question absolutely. I think there was not an absolute delivery on the 6th day of October, 1899, to take effect at the time; for there is no pretense that the deeds were delivered to a third person, to be a second time delivered after the death of complainant and his wife, Candace. Then, did the complainant part with the possession of the deeds, with all power and control over them, for the benefit of the grantees ? Had he any right, while the deeds were in the shoe-box in the bureau drawer, to take them, to control them ? The mere fact that the defendants had access to the drawer and to the shoe-box does not argue against the fact that the box belonged to complainant, and was his exclusive property, if he so desired to consider it. I am unable to understand how complainant could have been more possessed of, or had more control over, these deeds than has developed by the testimony. Even had he put them in his coat pocket, and hung the coat up in his own room, defendants could have taken them had they so desired, and made just as reasonable a claim therefor. It is true it is claimed that, at the time of the alleged delivery, complainant was passive, and said nothing when the mother said, 'Boys, here are your deeds.' But was the mother the agent for the father at that time to act for him ? In the case of *Harris* v. *Smith*, 79 Mich. 54 (44 N. W. 169, 6 L. R. A. 702), the court said:

" 'No claim is made that the deceased, by any word of his, ever promised payment; but it is insisted that this promise, made by the mother in the presence and hearing of her husband, that the plaintiff should be paid, was binding upon the deceased. This would be true, with some additional elements. If the mother made the prom-

ise, in the presence and hearing of her husband, that the husband should pay the plaintiff wages for her services, and the husband knew that she continued her service in reliance upon the promise, it would be such an acquiescence in the arrangement on his part that he would be bound by it, the same as though he had made the promise himself. This would amount to express authority on his part to the wife to make the contract. But the law does not authorize the wife, acting as agent for the husband, to bind him by her contracts, except for necessaries.'

"With the understanding which the father now claims he had, and the object for which the deeds were clearly executed, it could not be claimed that he was consenting to a delivery of the deeds absolutely and *in præsenti.* Defendants were to have the deeds, if at all, when complainant and his wife were dead; and I am satisfied that they all so understood it, and that the exhibition of the deeds by the mother to the sons was an assurance to them of what their father and mother desired to do for them after their death, and no thought occurred to any of them at that time that there was a present delivery of the deeds.

"But stronger than any language appears the actions of all the parties concerned. After the execution of the deeds, and while they were in the shoe-box in the bureau drawer, complainant and his wife, Candace, dealt with the property in question the same as though the deeds had not been executed. They executed in their own name a mortgage against the lands for a part of the purchase price, $600, and became personally liable for the payment. If the property belonged to defendants, and it was clearly so understood, why did they not record their deeds and execute the mortgage, and become themselves personally liable therefor? Later, when the mother called her oldest son to her bedside, and told him to put the deeds on record,—if she did so tell him,—why so long delay from October, 1900, to March, 1901, before he removed them from the shoe-box, and why were they kept from record, after they were removed in the month of March, until September 30th following? There seems to be no sufficient answer to satisfy the mind of the court for this long delay. * * *

"If the deeds belonged to defendants, and they had been delivered to them as claimed, then it was entirely unnecessary for either of the defendants to surreptitiously take these deeds from the box in which they were kept, without the knowledge or consent of complainant, and

place them upon record. And I do not understand now that defendants seriously claim that they are entitled to the absolute present possession and ownership of the land in question, or that they can sell or mortgage it without considering the rights of complainant. If this is true, then it must be true that these deeds were never intended to be delivered to them, or either. of them, at the time they were executed and brought home, October 6, 1899."

The son Wayne did not appeal. The question involved is a question of fact. In addition to what appears in the opinion from which we have quoted, the complainant testified that, shortly before his wife died, the following paper was prepared and signed by himself and wife, to be pinned to the deeds, and that he supposed it was done; that after the deeds had been taken, while searching in his box for them, he found it pinned to one of his pension papers:

"MARSHALL, MICH., September 11, 1900.
"We do hereby certify that the deeds that we have made over to Waylie and Wayne are not to be recorded until after we are both dead, and then the two boys are to give Myrtie Henry a note for $500 for her share, to be paid out of the personal property as far as it goes, and the rest the boys must make up to her. After this is done, then the deeds are to be Wayne's and Waylie's.
[Signed]     "C. A. ROUP.
"MRS. C. A. ROUP." .

The solicitors for defendant insist that the paper is a forgery, but, if it is not, that the words "we have made over" indicate an understanding that the deeds had then been delivered. When taken in connection with where the deeds were, the other language in the paper, and where this paper was left, we think it indicates quite the contrary. It would not be profitable to recite the testimony in detail, but a careful reading of the entire record satisfies us the trial court made a right disposition of the question of fact. See *Pennington* v. *Pennington*, 75 Mich. 600 (42 N. W. 985); *Burk* v. *Sproat*, 96 Mich. 404 (55 N. W. 985).

It is strongly urged by counsel, under the principle that

"he who seeks equity must do equity," that at least a lien should be given on the land to the defendant for the value of his services. The claim made by defendant in his sworn answer and his testimony upon the trial are inconsistent, and, when taken in connection with the other evidence, do not satisfy us of his right to any such relief.

The decree of the court below is affirmed.

CARPENTER, MONTGOMERY, and HOOKER, JJ., concurred. GRANT, J., took no part in the decision.